**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

| | | |
|---|---|---|
| **HOWARD SMITH,** | : | |
| | : | |
| **Plaintiff,** | : | |
| | : | |
| **v.** | : | **CIVIL ACTION FILE NO.** |
| | : | **1:14-cv-03139-AJB** |
| **CAROLYN W. COLVIN,** | : | |
| ***Acting Commissioner of*** | : | |
| ***Social Security***, | : | |
| | : | |
| **Defendant.** | : | |

<u>**O R D E R   A N D   O P I N I O N**</u>[1]

Plaintiff Howard Smith ("Plaintiff") brought this action pursuant to

sections 205(g) and 1631(c)(3) of the Social Security Act, 42 U.S.C. §§ 405(g),

1383(c)(3), to obtain judicial review of the final decision of the Commissioner of the

Social Security Administration ("the Commissioner") denying his application for

Disability Insurance Benefits ("DIB") and Supplemental Security Income Benefits

---

[1]     The parties have consented to the exercise of jurisdiction by the undersigned pursuant to 28 U.S.C. § 636(c) and Rule 73 of the Federal Rules of Civil Procedure.  (*See* Dkt. Entries dated 10/2/14 & 10/6/14).  Therefore, this Order constitutes a final Order of the Court.

("SSI") under the Social Security Act.[2]   For the reasons below, the undersigned **AFFIRMS** the final decision of the Commissioner.

## I.   PROCEDURAL HISTORY

Plaintiff filed applications for DIB and SSI in September 2010, alleging disability commencing on April 1, 2007. [Record (hereinafter "R") 134-50]. Plaintiff's applications were denied initially and on reconsideration.  [R75-78].  Plaintiff then requested a hearing before an Administrative Law Judge ("ALJ").  [R91-100].  An evidentiary hearing was held on February 28, 2013.  [R60, 126].  The ALJ issued a decision on July 26, 2013, denying Plaintiff's application on the ground that he had not been under a "disability" from the alleged onset date through the date of the decision.

---

[2]      Title II of the Social Security Act provides for federal Disability Insurance Benefits.   42 U.S.C. § 401 *et seq*.   Title XVI of the Social Security Act, 42 U.S.C. § 1381, *et seq*., provides for Supplemental Security Income Benefits for the disabled.  Title XVI claims are not tied to the attainment of a particular period of insurance disability.  *Baxter v. Schweiker*, 538 F. Supp. 343, 350 (N.D. Ga. 1982). Otherwise, the relevant law and regulations governing the determination of disability under a claim for DIB are nearly identical to those governing the determination under a claim for SSI. *Wind v. Barnhart*, 133 Fed. Appx. 684, 690 n.4 (11th Cir. June 2, 2005) (citing *McDaniel v. Bowen*, 800 F.2d 1026, 1031 n.4 (11th Cir. 1986)).   In general, the legal standards to be applied are the same regardless of whether a claimant seeks DIB, to establish a "period of disability," or to recover SSI, although different statutes and regulations apply to each type of claim. *See* 42 U.S.C. § 1383(c)(3) (establishing that the judicial provisions of 42 U.S.C. § 405(g) are fully applicable to claims for SSI). Therefore, to the extent that the Court cites to SSI cases, statutes, or regulations, they are equally applicable to Plaintiff's DIB claims, and vice versa.

2

[R57-74].  Plaintiff sought review by the Appeals Council, and the Appeals Council denied Plaintiff's request for review on August 1, 2014, making the ALJ's decision the final decision of the Commissioner.  [R3-8].

Plaintiff then filed suit in this Court on September 30, 2014, seeking review of the Commissioner's decision.  [Doc. 1].  The answer and transcript were filed on January 14, 2015.  [Docs. 7, 8].  On March 23, 2015, Plaintiff filed a brief in support of his petition for review of the Commissioner's decision, [Doc. 12], and on April 22, 2015, the Commissioner filed a response in support of the decision, [Doc. 13].[3]  The matter is now before the Court upon the administrative record, the parties' pleadings, and the parties' briefs, and it is accordingly ripe for review pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3).

## II.   STATEMENT OF FACTS[4]

### A.   *Background*

Having a date of birth of May 21, 1971, Plaintiff was thirty-five years old on the alleged onset date and forty-two years old at the time of the ALJ's decision.

---

[3]     Plaintiff did not file a reply brief, and neither party requested oral argument.  (*See* Dkt.).

[4]     In general, the records referenced in this section are limited to those deemed by the parties to be relevant to this appeal.  [*See* Docs. 12, 13].

AO 72A
(Rev.8/8
2)

[R14-15, 69, 134].  Plaintiff previously worked as a cook's helper and as a carhop. [R15, 17, 48, 69, 134, 180, 185].  Plaintiff alleged disability beginning in April 2007 because of depression, bipolar disorder, and asthma.  [R179].

### B.    Lay Testimony

In his hearing before the ALJ, Plaintiff testified that the last grade of school he completed was either the ninth or the tenth grade.  [R15].  He indicated that he knew he was having mental health problems as a child, but both of his parents died when he was young, and he did not have anyone to help him.  [R18-19].  He stated that he had lived on the street from 2007 until 2010, when he started receiving $225 a month in general assistance and $200 in food stamps, and he presently lived in his friend's basement for $225 per month.  [R16-19].

He indicated that he also began receiving mental-health treatment in 2010 and was taking Wellbutrin[5] and Seroquel.[6]  [R19, 31, 41-42].  He reported that he had also

_____

[5]     Wellbutrin (bupropion) is an antidepressant that works by increasing certain types of activity in the brain.  MedlinePlus, Bupropion, http://www.nlm.nih.gov/medlineplus/druginfo/meds/a695033.html  (last  visited 3/27/16).

[6]     Seroquel (quetiapine) is used to treat the symptoms of schizophrenia, mania, and depression. MedlinePlus, Quetiapine, http://www.nlm.nih.gov/medlineplus/druginfo/meds/a698019.html  (last  visited 3/27/16).

4

tried trazodone[7] but that he did not like it because it made him sleep too hard. [R45-46]. He stated that the medication helped somewhat, but he still had a lot of problems with concentrating and thinking, had difficulty sleeping at night, had violent nightmares, worried a lot, and was scared of people. [R20, 33-34, 38]. He also reported that his medication makes him sleepy and gives him headaches. [R20, 30, 41-42]. Plaintiff also indicated that he had difficulty getting his doctors to fill out his disability paperwork because he kept getting transferred to new physicians and they told him they needed to get to know him first. [R37-38].

Plaintiff stated that any cooking he did was on a hotplate or in a microwave oven and that he did not do any housework because it was not necessary. [R21-22]. He stated that his friend would do his grocery shopping because Plaintiff would get short of breath if he walked too far and because Plaintiff did not drive. [R23]. He testified that he did not read, did not watch television, and kept the radio on but did not really listen to it. [R31-33]. Later in the hearing, Plaintiff reported that he would sometimes look at a magazine or try to read a book but could never finish a book. [R46-47].

---

[7]      Trazodone is a serotonin modulator used to treat depression. *See* MedlinePlus, *Trazodone*, http://www.nlm.nih.gov/medlineplus/druginfo/meds/a681038.html (last visited 3/27/16).

AO 72A (Rev.8/8 2)

Plaintiff stated that he had a diagnosis of major depression, cried three or four days per week, sometimes all day, and thought about suicide "all the time." [R33-36]. He also stated that he had homicidal thoughts every day, all day long; had attempted suicide multiple times; had daily hallucinations about people following him; had a very low energy level; was paranoid and nervous around people; did not get along with people very well because he believed they were out to get him; stayed to himself; and had racing thoughts. [R34-36]. Plaintiff also reported that he had tried group therapy but could not stand being around a crowd of people. [R44]. He stated that he had been hospitalized for a suicide attempt in 2005. [R49].

### C.    *Administrative Records*

In an undated adult disability report, Plaintiff stated that he could not work because he had depression, bipolar disorder, and asthma. [R179]. He reported that he had completed the twelfth grade and did not attend special-education classes. [R180]. He stated that he had worked as a cook for four years until he stopped working in 2007. [R179-80].

### D.    *Medical Records*

Plaintiff started treatment at Grady Health System's Central Fulton Community Mental Health Center on January 3, 2010. [R318]. He reported that he was depressed

6

and had poor concentration and insomnia, and he stated that he had never taken medication.  [R318, 321].  He denied hopelessness, helplessness, and guilt.  [R321]. He also reported that he was unemployed and that his girlfriend was moving to California.  [R320].  It was noted that Plaintiff did not have suicidal ideation or homicidal ideation and denied having made any suicide attempts or having any history of psychiatric symptoms.  [R315, 319, 321, 502].  Plaintiff was diagnosed with major depression, moderate, recurrent; prescribed Celexa[8] and trazodone; and assessed a Global Assessment of Functioning ("GAF") score of 50 to 60.[9]  [R311-12, 320].

Plaintiff underwent a behavioral health assessment on March 29, 2010.  [R305]. His primary problem was noted to be depression, and it was also noted that Plaintiff

---

[8]     Celexa (citalopram) is a selective serotonin reuptake inhibitor ("SSRI") used to treat depression. MedlinePlus, Citalopram, http://www.nlm.nih.gov/medlineplus/druginfo/meds/a699001.html (last visited 3/27/16).

[9]     The GAF is a numeric scale (0 through 100) that considers psychological, social, and occupational functioning on a hypothetical continuum of mental health illness.  *Diagnostic and Statistical Manual of Mental Disorders* 32-34 (4th ed., Text Revision, 2000).  A GAF score between 41 and 50 indicates "[s]erious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)."  *Id.* at 34.  A GAF score between 51 and 60 indicates "[m]oderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)."  *Id.*

AO 72A
(Rev.8/8
2)

reported auditory hallucinations of whispering, that it was suspected that he was abusing alcohol, and that while he was observed to have tight associations, he was also observed to have a depressed mood, flat affect, reduced energy level and sleep, and disrupted sleep. [R305]. He denied suicidal and homicidal ideation. [R305]. He reported that he had been out of medication for one and one-half months. [R305]. Plaintiff stated that he was unemployed and homeless, but not in a shelter, and that he had been in school through the twelfth grade. [R305]. In the section of the form reserved for describing coping approaches, the notes state: "go to sleep, walking, get me a beer, sit in the park." [R306]. In the section describing activities of daily living, it was noted that Plaintiff ate at least two basically nutritious meals daily, participated in relaxation activities, used other community services, and cared for his personal cleanliness and appearance, and notes indicate that Plaintiff reported, "I stay to myself and get a lot of exercise." [R307]. Identified abilities included "literacy/basic math" and "mobility within community," and Plaintiff was also noted to receive enjoyment and satisfaction from his ability to function in daily life, his ability to get around physically, and his ability to do work or hobbies. [R308].

Plaintiff was treated at Grady on March 30, 2010, for depression. [R297]. He reported that he was unemployed, homeless, and had no source of income. [R302]. He

8

stated that he had been raised by his mother until she died when he was seventeen and then he went to live with his father. [R300]. He indicated that he had graduated from high school. [R300]. He reported that he had previously been treated with Celexa and trazodone but that the trazodone was not effective. [R297]. He had not had medication since late January. [R297]. He reported that he had low energy, sadness, sleep problems, crying spells, racing thoughts, helplessness, and hopelessness, and he reported that he had attempted suicide in 2005 by overdosing on pills. [R300]. He also reported having auditory hallucinations. [R300]. He was noted to be attentive; oriented to person, place, situation, and time; to be cooperative and logical; and to have a euthymic mood,[10] and he denied suicidal ideation. [R300]. He was unable to process serial sevens but could spell "world" forward and backward. [R300]. Plaintiff was diagnosed with major depression with psychotic features, restarted on Celexa and trazodone, and assigned a GAF score of 50. [R298, 301-02, 355].

---

[10]    "Euthymic" relates to a moderate mood—"not manic or depressed." 606 *PDR Med. Dictionary* (1st ed. 1995).

Plaintiff again visited Grady on June 5, 2010.  [R517].  It was noted that Plaintiff was not suicidal or homicidal but that he was hallucinatory and his affect was restricted.  [R517].  He was given Celexa, Risperdal,[11] and trazodone.  [R517].

At a visit to Grady taking place on September 9, 2010, it was noted that Plaintiff was not suicidal or homicidal but that he was hallucinating hearing a female voice.  [R513].  Plaintiff was diagnosed with major depression with psychotic features and given medication.  [R513].

Progress notes by Jochebed Ann Pink, M.D., dated January 5, 2011, indicate diagnoses of, among other things, asthma, chronic obstructive pulmonary disease ("COPD"), depression, and bipolar disorder.  [R338].  Plaintiff was noted to be taking Celexa, Risperdal, and trazodone for bipolar disorder/depression.  [R338].  He reported that he was unemployed, homeless, and slept for only two or three hours per night.  [R338].  He denied suicidal or homicidal thoughts.  [R338].  He was followed in the asthma clinic and used an albuterol inhaler daily.  [R339].

---

[11]    Risperdal is a brand name for risperidone, one of a class of medications known as atypical antipsychotics.  It is typically prescribed to treat symptoms of schizophrenia and bipolar disorder and to treat behavior problems, such as aggression, self-injury, and sudden mood changes.  Risperidone, MedlinePlus, http:/www.nlm.nih.gov/medlineplus/druginfo/meds/a694015.html (last visited 3/27/16).

AO 72A
(Rev.8/8
2)

At a visit to Grady taking place on March 10, 2011, Plaintiff stated that he was not suicidal or homicidal, but he stated that he was having intermittent hallucinations. [R1048].  He was assessed with major depressive disorder with psychotic features, and cluster B traits[12] were suspected.  [R1048].  Plaintiff's dose of Risperdal was increased, he was continued on Celexa and trazodone, and he was referred to anger management group therapy.  [R1048].

Plaintiff presented for a psychological evaluation with John S. Muller, Ph.D., on April 26, 2011.  [R389-94].  Plaintiff stated that he had suffered from emotional problems all his life but that he began treatment only about three or four years prior. [R391].  Plaintiff reported hospitalization in 2007 after a suicide attempt by overdose, and another three or four hospitalizations after that at Grady Hospital and one at Atlanta Medical Center.  [R391, 393].  He stated that on the one occasion he had actually attempted suicide and the other times, he simply was to the point of planning his suicide. [R391].  He said that his medications "helped some" but that he remained sad more days than not, continued to contemplate suicide, and could not sleep without

---

[12]     In the Diagnostic and Statistical Manual of Mental Disorders, personality disorders are grouped into three clusters based on descriptive similarities.  *Diagnostic and Statistical Manual of Mental Disorders* 646 (5th ed. 2013).  "Cluster B" includes antisocial, borderline, histrionic, and narcissistic personality disorders.  *Id.*  "Individuals with these disorders often appear dramatic, emotional, or erratic."  *Id.*

11

medication.  [R391].  He stated, however, that he did not have current suicidal ideas.  [R393].  He also claimed to hear a voice of indeterminate sex tell him to harm himself and others, and he stated that medication did not help to decrease his hallucinations.  [R393].

Plaintiff indicated that two weeks earlier he had begun living with a male roommate in an apartment.  [R391].  He stated that he had no income aside from food stamps and an occasional general-assistance payment.  [R391].  He reported that he had never had a driver's license, had never driven, and was able to use public transportation.  [R391-92].  Plaintiff reported that he had dropped out of school in the ninth grade when his father died and that he remembered being in the "slow classes."  [R392].  He reported that his sleep was good, but only when he took trazodone, and even then, he still had episodes of early awakening.  [R392].  He also stated that he was a trained chef, although he no longer made the complex meals he once enjoyed.  [R392].  He indicated that he was a church member and went to services regularly but was not otherwise interested in going out in public, stating that he was not interested in dating and that he tried to send a friend to do his shopping.  [R392].  Dr. Muller observed that although Plaintiff tended to be vague at times, "there was no indication that he was intentionally distorting the facts of his case.  [R392].

12

Dr. Muller found that Plaintiff's affect was restricted in range, and although he smiled briefly, he came across as indifferent, sad, and helpless. [R393]. Plaintiff performed serial threes by two positions correctly, using his fingers to do so. [R393]. He could not spell "world" forward, but he could spell "cat" backward and forward. [R393]. Dr. Muller opined that Plaintiff's cognitive functions were impaired for measure of immediate memory, and although the state agency did not request intellectual testing, he estimated Plaintiff to be within the borderline range of intelligence based on the quality of his speech and vocational history. [R393].

Dr. Muller diagnosed major depressive disorder, recurrent, severe with psychosis (in fair remission). [R393]. He wrote that Plaintiff had been experiencing significant depression over the last four or five years; that during this time, he had four inpatient psychiatric hospitalizations, all for either suicide attempts or contemplation of such; and his last hospitalization had been two years prior to the examination. [R393]. Dr. Muller also wrote that Plaintiff had become emotionally withdrawn from others and spoke of indifference in having emotional contact with others but that he did not appear to have any paranoia or anxiety related to his social interaction. [R393-94]. He also opined that Plaintiff "could probably get along with people who were understanding and compassionate of his emotional situation"; that he would have no trouble with

13

understanding or carrying out simple instructions; that despite some limitations in concentration, he could focus long enough to complete his basic activities of daily living and enjoy listening to talk shows; and that if he were found eligible for Social Security benefits, he would be able to manage the funds in his own best interest. [R394].

In a Psychiatric Review Technique form dated May 29, 2011, non-examining state agency review physician Fran Shahar, Ph.D. opined that Plaintiff had moderate limitations in his abilities to: 1) carry out detailed instructions; 2) maintain attention and concentration for extended periods; 3) perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; 4) complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; 5) interact appropriately with the general public; 6) accept instructions and respond appropriately to criticisms from supervisors; 7) get along with coworkers or peers without distracting them or exhibiting behavioral extremes; 8) maintain socially appropriate behavior and adhere to basic standards of neatness and cleanliness; and 9) respond appropriately to changes in the work setting.  [R395-96].  Dr. Shahar further opined that Plaintiff could perform and recall simple instructions; despite his

14

likelihood of having difficulties with concentration, persistence, and pace, he had the ability to perform simple, repetitive tasks for two-hour periods; he may have some difficulty adhering to a work schedule and maintaining a routine; he was at a moderate risk of decompensating under ordinary work stress; and he was likely to have difficulty with frequent or major workplace changes but not with lesser ones. [R397]. As for social limitations, Dr. Shahar opined that Plaintiff might have difficulty interacting with the public, coworkers, and supervisors, but generally could interact appropriately in the workplace. [R397]. In a mental Residual Functional Capacity ("RFC") form, Dr. Shahar found moderate difficulties in maintaining social functioning and moderate difficulties in maintaining concentration, persistence, or pace. [R409].

At a visit to Grady taking place on June 7, 2011, Plaintiff denied having any thoughts of hurting himself or others. [R435]. At a visit to Grady on June 14, 2011, Plaintiff reported that he had homicidal thoughts about a month ago. [R1043]. He was noted to be in a euthymic mood, and notes indicate that his affect was not typical of any particular psychotic illness. [R1043]. At a visit taking place on August 30, 2011, he reported having suicidal thoughts. [R1033]. On November 22, 2011, he was noted to have some suicidal or homicidal thoughts but no plan or intent. [R1034].

15

On December 8, 2011, reviewing physician Abraham Oyewo, M.D., completed a physical RFC.  [R551-58].  He opined that Plaintiff had no exertional or other physical limitations other than the need to avoid concentrated exposure to fumes, odors, dusts, gases, poor ventilation, and the like.  [R552-55].  He noted that Plaintiff was obese and that he alleged pain limiting his ability to lift, squat, stand, reach, walk, and kneel, but he found the alleged severity to be inconsistent with the objective evidence and therefore concluded that Plaintiff's statements were only partially credible.  [R556].

In a Psychiatric Review Technique form dated December 9, 2011, non-examining state agency review physician Anna J. Williams, Ph.D., opined that Plaintiff met the A criteria of Listing 12.04.  [R562].  Specifically, she indicated that Plaintiff had disturbance of mood, accompanied by a full or partial manic or depressive syndrome, as evidenced by depressive syndrome characterized by: anhedonia or pervasive loss of interest in almost all activities; sleep disturbance; difficulty concentrating or thinking; and hallucinations, delusions, or paranoid thinking.  [R562]. Dr. Williams further opined Plaintiff had moderate restriction of activities of daily living; moderate difficulties in maintaining social functioning; and moderate difficulties in maintaining concentration, persistence or pace.  [R569].

16

In a mental RFC assessment, Dr. Williams opined that Plaintiff has marked limitations in the abilities to: 1) understand and remember detailed instructions; 2) carry out detailed instructions; and 3) interact appropriately with the general public. [R573-74].  Dr. Williams also opined that Plaintiff had moderate limitations in the abilities to 1) maintain attention and concentration for extended periods; 2) perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; 3) sustain an ordinary routine without special supervision; 4) complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; 5) maintain socially appropriate behavior and adhere to basic standards of neatness and cleanliness; 6) respond appropriately to changes in the work setting; and 7) set realistic goals or make plans independently of others.  [R573-74].  Dr. Williams elaborated on her assessment, stating that Plaintiff could concentrate for at least two hours at a time and could follow and perform simple instructions; that although Plaintiff had marked limitations in direct work with the public, he could relate and go out in public and be cooperative; that although he would have initial moderate limitations in work changes and setting

17

independent goals, he would adapt with practice and familiarity; and that he had no substantial psychological limitations at that time.  [R575].

Plaintiff returned to Grady on February 16, 2012.  [R633].  His mood was noted to be euthymic and he reported having intermittent hallucinations.  [R633].  He was diagnosed with major depressive disorder and psychosis and given refills for Celexa, Risperdal, and trazodone.  [R633].

In a medical source statement dated April 10, 2012, J. Wooten, M.D., of the Fulton County Department of Family and Children Services, wrote that she had examined Plaintiff on February 16, 2012, and was treating Plaintiff for major depression with psychotic features and for chronic auditory hallucinations.  [R640]. She stated that Plaintiff was on a high dose of anti-psychotic medication and continued to have auditory hallucinations and that his prognosis was "guarded."  [R640].  The same date, Jochebed Ann Pink, M.D., wrote that in addition to being followed in the psychiatric clinic for bipolar disorder and depression with psychotic features, Plaintiff was also being treated for high blood pressure, asthma, diastolic heart failure, and morbid obesity.  [R641].

At a visit to Grady taking place on May 11, 2012, Plaintiff was noted not to be suicidal or homicidal, but he reported having attempted suicide approximately ten years

prior by taking a handful of pills. [R631]. He was observed to have a depressed and anxious mood. [R631]. He was assessed with manic psychosis and prescribed Seroquel, Celexa, and Wellbutrin. [R631].

At a visit to Grady on August 3, 2012, Plaintiff was treated by Jennifer Snowden, M.D. [R1037]. He reported suicidal thoughts but no intent or plan. [R1037]. It was noted that Plaintiff's mood was irritable and that he had poor judgment and insight, but that despite his complaints, Plaintiff's affect was "fairly bright" and he laughed at times. [R1028, 1037]. It was noted that Plaintiff demanded that Dr. Snowden fill out disability paperwork and that he was "fixated" on having the paperwork completed. [R1028, 1037]. He was diagnosed with major depressive disorder by history, partial malingering, and cluster B traits, and he was continued on medication. [R1037].

At a visit with Dr. Snowden taking place on October 15, 2012, Plaintiff was noted to be irritable. [R1038]. He was diagnosed with major depressive disorder by history, partial malingering, and cluster B traits, and continued on Wellbutrin, Celexa, and Seroquel. [R1038]. Dr. Snowden noted that Plaintiff was generally stable on medication and stated that she remained suspicious for malingering of hallucinations and violent and suicidal thoughts because his affect was "bright," he appeared to be in

19

a good mood, and he spent the majority of his appointment complaining about not getting his Social Security paperwork filled out.  [R1027, 1039].

At a visit to Grady taking place on January 9, 2013, it was noted that when asked whether he had thoughts of hurting himself or others, Plaintiff said no.  [R883, 923].

In a letter dated February 18, 2013, Dr. Snowden wrote that Plaintiff was currently a patient under her care at the Grady Outpatient Behavioral Health Clinic; that he had been diagnosed with major depressive disorder with psychotic features; and that his medications were Benadryl 50 mg at bedtime, Seroquel 400 mg at bedtime, Celexa 40 mg daily, and Wellbutrin SR 150 mg twice daily.  [R638].

Plaintiff continued with regular treatment at Grady Memorial Hospital.  On June 17, 2013 he was noted to be "profoundly depressed" with strong passive and weak active suicidal ideation and auditory hallucinations.  [R1086].  The medical provider opined that Plaintiff had decompensated due to several new psychological stressors. [R1086].  Plaintiff was admitted to the hospital with suicidal ideation, hallucinations, and depression.  [R1113].

20

### E.    Vocational-Expert Testimony

The ALJ asked the vocational expert ("VE") about the working capabilities of a person of Plaintiff's age, education, and work experience who was capable of light work; could not climb ropes, ladders, or scaffolds; could not perform work requiring fine vision, such as threading a needle or reading fine print; must avoid concentrated exposure to pulmonary irritants and hazards; would be limited to simple tasks, defined as "working at skill levels 1 or 2"; would be limited to low-stress jobs, defined as few changes in the work place and occasional simple decisionmaking; and would be limited to occasional superficial contacts with the general public.  [R50].  The VE testified that the person could not perform Plaintiff's past work as a carhop or a cook's helper. [R50-51].  The VE also testified, however, that the person could work as a garment bagger, laundry folder, or bakery work racker.  [R51].

## III.    ALJ'S FINDINGS OF FACT

The ALJ made the following findings of fact and conclusions of law:

1.    The claimant meets the insured status requirements of the Social Security Act through December 31, 2012.

2.    The claimant has not engaged in substantial gainful activity since April 1, 2007, the alleged onset date (20 CFR 404.1571 *et seq*., and 416.971 *et seq*.).

21

3.    The claimant has the following severe impairments: major depressive disorder, cluster B traits, asthma, hypertension, recent (post hearing) diagnosis of stage 2 diastolic dysfunction,[13] refractive amblyopia,[14] and obesity (20 CFR 404.1520(c) and 416.920(c)).

. . .

4.    The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

. . .

5.    After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except the claimant cannot climb ropes, ladders or scaffolding.  He must avoid concentrated exposure to pulmonary

_____

[13]    "Diastolic dysfunction" refers to an abnormality in how the heart fills with blood during the first part of the two parts of a heartbeat.  Texas Heart Institute, Diastolic Dysfunction, http://www.texasheart.org/HIC/Topics/Cond/ddisfunc.cfm (last visited 3/27/16).

[14]    "Amblyopia" is decreased vision in one or both eyes due to abnormal development of vision in infancy or childhood.  Refractive amblyopia happens when there is a large or unequal amount of refractive error between a child's eyes.  The brain learns to see well from the eye that has less need for correction and does not learn to see well from the other.  Glasses may improve acuity but usually not completely.  Am. Assoc. for Pediatric Ophthalmology & Strabismus, Amblyopia, http://www.aapos.org/terms/conditions/21 (last visited 3/27/16).

irritants and hazards.  He cannot perform jobs requiring fine vision such as threading a needle or reading fine print.  He can perform simple (skill levels 1-2), low stress (few changes in workplace and occasional simple decisionmaking) jobs only, and can have only occasional superficial contacts with the general public.

. . .

6.      The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

. . .

7.      The claimant was born on May 21, 1971 and was 35 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date (20 CFR 404.1563 and 416.963).

8.      The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564 and 416.964).

9.      Transferability of job skills is not an issue in this case because the claimant's past relevant work is unskilled (20 CFR 404.1568 and 416.968).

10.     Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569(a), 416.969, and 416.969(a)).

. . .

11.     The claimant has not been under a disability, as defined in the Social Security Act, from April 1, 2007, through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

AO 72A
(Rev.8/8
2)

[R60-69].

In support of his determination as to the mental RFC, the only portion of the RFC Plaintiff challenges here, the ALJ explained that he found Plaintiff's claims questionable because his testimony to a very limited lifestyle with little mental capacity and exertion was not in keeping with the findings reported by his treating physicians: although he testified to having mental issues his whole life, he made no complaints about any mental illnesses from 2007 to 2009, and when he was first diagnosed with major depressive disorder in January 2010, he said he had been depressed for only three months and denied any visual or auditory hallucinations; Dr. Snowden indicated that Plaintiff's hallucination allegations and his vague suicidal/homicidal ideation suggested partial malingering; in February 2012, Plaintiff admitted that he did not find the auditory hallucinations distressing; notes indicating Plaintiff had a "bright" affect belie his allegation that he is depressed all the time; records do not support his claims of crying three to four times per week, sometimes all day; notes indicating a lack of suicidal/homicidal ideation belie his testimony that he has suicidal ideation all the time and that those ideas never leave his mind; and despite his testimony and other claims of having been hospitalized for suicidal attempts, there is no corroborating evidence in the record and there is evidence that at least once he denied previous psychological

24

hospitalization.  [R66-67].  The ALJ also explained that he assigned treating-physician Dr. Snowden's opinion of partial malingering full weight; he assigned consulting examiner Dr. Muller's assessments and opinions less weight because of the cited credibility concerns as well as unsupported allegations of multiple suicide attempts; and he gave the opinions of state agency psychological consultants Dr. Shahar and Dr. Williams great weight because they were consistent with the other evidence in the record and were not contradicted.  [R67].  Finally, the ALJ explained that because he found Plaintiff to be unable to perform his past work, he relied on the VE's testimony that a person of Plaintiff's age, education, and RFC was capable of working as a garment bagger, laundry folder, or bakery worker, and he therefore found Plaintiff capable of work existing in significant numbers in the national economy.  [R68-69].

## IV.    STANDARD FOR DETERMINING DISABILITY

An individual is considered disabled for purposes of disability benefits if he is unable to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A).  The impairment or impairments must result from anatomical, psychological, or physiological abnormalities

25

which are demonstrable by medically accepted clinical or laboratory diagnostic techniques and must be of such severity that the claimant is not only unable to do previous work but cannot, considering age, education, and work experience, engage in any other kind of substantial gainful work that exists in the national economy. 42 U.S.C. §§ 423(d)(2)-(3), 1382c(a)(3)(B), (D).

The burden of proof in a Social Security disability case is divided between the claimant and the Commissioner.  The claimant bears the primary burden of establishing the existence of a "disability" and therefore entitlement to disability benefits. *See* 20 C.F.R. §§ 404.1512(a), 416.912(a).   The Commissioner uses a five-step sequential process to determine whether the claimant has met the burden of proving disability. *See* 20 C.F.R. §§ 404.1520(a), 416.920(a); *Doughty v. Apfel*, 245 F.3d 1274, 1278 (11th Cir. 2001); *Jones v. Apfel*, 190 F.3d 1224, 1228 (11th Cir. 1999). The claimant must prove at step one that he is not undertaking substantial gainful activity.   *See* 20 C.F.R. §§ 404.1520(a)(4)(i), 416.920(a)(4)(i).   At step two, the claimant must prove that he is suffering from a severe impairment or combination of impairments that significantly limits his ability to perform basic work-related activities. *See* 20 C.F.R. §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii).  At step three, if the impairment meets one of the listed impairments in Appendix 1 to Subpart P of Part 404 (Listing of

26

Impairments), the claimant will be considered disabled without consideration of age, education, and work experience. *See* 20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii).  At step four, if the claimant is unable to prove the existence of a listed impairment, he must prove that his impairment prevents performance of past relevant work. *See* 20 C.F.R. §§ 404.1520(a)(4)(iv), 416.920(a)(4)(iv).  At step five, the regulations direct the Commissioner to consider the claimant's residual functional capacity, age, education, and past work experience to determine whether the claimant can perform other work besides past relevant work. *See* 20 C.F.R. §§ 404.1520(a)(4)(v), 416.920(a)(4)(v).  The Commissioner must produce evidence that there is other work available in the national economy that the claimant has the capacity to perform. *Doughty*, 245 F.3d at 1278 n.2.  To be considered disabled, the claimant must prove an inability to perform the jobs that the Commissioner lists. *Id.*

If at any step in the sequence a claimant can be found disabled or not disabled, the sequential evaluation ceases and further inquiry ends. *See* 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4).  Despite the shifting of burdens at step five, the overall burden rests on the claimant to prove that he is unable to engage in any substantial gainful activity that exists in the national economy. *Doughty*, 245 F.3d at 1278 n.2; *Boyd v. Heckler*, 704 F.2d 1207, 1209 (11th Cir. 1983),

27

*superseded by statute on other grounds by* 42 U.S.C. § 423(d)(5), *as recognized in Elam v. R.R. Ret. Bd.*, 921 F.2d 1210, 1214 (11th Cir. 1991).

## V.    SCOPE OF JUDICIAL REVIEW

A limited scope of judicial review applies to a denial of Social Security benefits by the Commissioner.  Judicial review of the administrative decision addresses three questions:  (1) whether the proper legal standards were applied; (2) whether there was substantial evidence to support the findings of fact; and (3) whether the findings of fact resolved the crucial issues.  *Washington v. Astrue*, 558 F. Supp. 2d 1287, 1296 (N.D. Ga. 2008); *Fields v. Harris*, 498 F. Supp. 478, 488 (N.D. Ga. 1980).  This Court may not decide the facts anew, reweigh the evidence, or substitute its judgment for that of the Commissioner.  *Dyer v. Barnhart*, 395 F.3d 1206, 1210 (11th Cir. 2005).  If substantial evidence supports the Commissioner's factual findings and the Commissioner applies the proper legal standards, the Commissioner's findings are conclusive.  *Lewis v. Callahan*, 125 F.3d 1436, 1439-40 (11th Cir. 1997); *Barnes v. Sullivan*, 932 F.2d 1356, 1358 (11th Cir. 1991); *Martin v. Sullivan*, 894 F.2d 1520, 1529 (11th Cir. 1990); *Walker v. Bowen*, 826 F.2d 996, 999 (11th Cir. 1987) (per curiam); *Hillsman v. Bowen*, 804 F.2d 1179, 1180 (11th Cir. 1986)  (per curiam); *Bloodsworth v. Heckler*, 703 F.2d 1233, 1239 (11th Cir. 1983).

28

"Substantial evidence" means "more than a scintilla, but less than a preponderance." *Bloodsworth*, 703 F.2d at 1239.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion, and it must be enough to justify a refusal to direct a verdict were the case before a jury. *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Hillsman*, 804 F.2d at 1180; *Bloodsworth*, 703 F.2d at 1239.  "In determining whether substantial evidence exists, [the Court] must view the record as a whole, taking into account evidence favorable as well as unfavorable to the [Commissioner's] decision." *Chester v. Bowen*, 792 F.2d 129, 131 (11th Cir. 1986) (per curiam).  Even where there is substantial evidence to the contrary of the ALJ's findings, the ALJ decision will not be overturned where "there is substantially supportive evidence" of the ALJ's decision.  *Barron v. Sullivan*, 924 F.2d 227, 230 (11th Cir. 1991).  In contrast, review of the ALJ's application of legal principles is plenary.  *Foote v. Chater*, 67 F.3d 1553, 1558 (11th Cir. 1995); *Walker*, 826 F.2d at 999.

## VI.   CLAIMS OF ERROR

Plaintiff contends that the ALJ erred by failing to properly evaluate Plaintiff's mental limitations and credibility, which then tainted the RFC and rendered the VE's testimony incapable of serving as substantial evidence of non-disability.  [Doc. 12].

29

The Commissioner, in response, argues that the ALJ applied the proper legal standards and that his decision is supported by substantial evidence.  [Doc. 13].

### A.      Mental Limitations

As noted above, the ALJ found that Plaintiff retained the RFC to perform a range of light work limited to "simple (skill levels 1-2), low-stress (few changes in workplace and occasional simple decisionmaking) jobs only" and "only occasional superficial contacts with the general public."  [R64].  Plaintiff first argues that the ALJ erred by failing to properly account for certain medical opinions.  [Doc. 12 at 9].  Second, Plaintiff contends that evidence in the record suggests cognitive impairments  and that the ALJ erred by failing to fill the gap with a consultative examination or expressly consider whether Plaintiff met Listing 12.05 (intellectual disability).  [*Id*. at 10-11].  Third, Plaintiff avers that the RFC does not adequately address his finding that Plaintiff had "moderate" difficulties in maintaining concentration, persistence, or pace.  [*Id*. at 11].

### 1.      Medical Opinions

Plaintiff argues first that the mental RFC is incomplete because the ALJ failed to properly account for the opinions of Dr. Muller, Dr. Williams, Dr. Shahar, and Dr. Oyewo.  [Doc. 12 at 9].  He points out that Dr. Muller is a consultative examiner

30

who opined that Plaintiff "could probably get along with people who were understanding and compassionate of his emotional situation" and that "[h]is concentration appears to be limited," [R394]; that Dr. Williams was a nonexamining state agency review physician who opined that Plaintiff has marked limitations in the abilities to understand and remember detailed instructions, carry out detailed instructions, and interact appropriately with the general public, [R573-74]; that Dr. Shahar wrote that Plaintiff is at moderate risk of decompensating under ordinary workplace stress, [R397]; and Dr. Oyewo completed a physical RFC, [R551-58]. [Doc. 12 at 9].

The Court finds no basis for reversal in Plaintiff's arguments. Plaintiff points out—correctly—that an individual can perform unskilled, competitive employment when he is able to, on a sustained basis,[15] (1) understand, carry out, and remember simple instructions, (2) respond appropriately to supervision, coworkers, and usual work situations, and (3) deal with changes in a routine work setting, and that a substantial loss of ability to meet any of these basic work-related activities would

_____

[15]     According to the Agency, an RFC is an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting for "8 hours a day, for 5 days a week, or an equivalent work schedule."  Social Security Ruling ("SSR") 96-8p.

31

severely limit the potential occupational base and therefore may justify a finding of disability.  [Doc. 12 at 8 (citing SSR 85-15[16])].  He also correctly points out that any impairment-related mental limitations created by the claimant's response to demands of work must be reflected in the RFC assessment, [Doc. 12 at 8 (citing SSR 85-15)], and that in order to determine that the ALJ's decision was supported by substantial evidence, it must be clear that the ALJ took into account evidence both favorable and unfavorable to his opinion, [Doc. 12 at 8 (citing *McCruter v. Bowen*, 791 F.2d 1544, 1548 (11th Cir. 1986); *Williams v. Colvin*, No. 1:12-cv-4276-WSD, 2014 WL 476571, at *21 (N.D. Ga. 2014) (Duffey, J., *adopting* Baverman, M.J.))].

_____

[16]     Social Security Rulings are published under the authority of the Commissioner of Social Security and are binding on all components of the administrative process.  *See Sullivan v. Zebley*, 493 U.S. 521, 530 n.9 (1990); *see also Tauber v. Barnhart*, 438 F. Supp. 2d 1366, 1377 n.6 (N.D. Ga. 2006) (Story, J.) (citing 20 C.F.R. § 402.35(b)(1)).  Although SSRs do not have the force of law, they are entitled to deference so long as they are consistent with the Social Security Act and regulations. *Massachi v. Astrue*, 486 F.3d 1149, 1152 n.6 (9th Cir. 2007); *see also Salamalekis v. Comm'r of Soc. Sec.*, 221 F.3d 828, 832 (6th Cir. 2000) ("If a Social Security Ruling presents a reasonable construction of an ambiguous provision of the Act or the agency's regulations, we usually defer to the SSR."); *Minnesota v. Apfel*, 151 F.3d 742, 748 (8th Cir. 1998) ("Social Security Rulings, although entitled to deference, are not binding or conclusive."); *Pass v. Chater*, 65 F.3d 1200, 1204 n.3 (4th Cir. 1995); *Gordon v. Shalala*, 55 F.3d 101, 105 (2d Cir. 1995); *Andrade v. Sec'y of Health and Human Servs.*, 985 F.2d 1045, 1051 (10th Cir. 1993).

AO 72A (Rev.8/82)

Be that as it may, the Court finds that the ALJ properly addressed each of the opinions Plaintiff challenges here. The Commissioner evaluates every medical opinion the agency receives, regardless of the source. 20 C.F.R. §§ 404.1527(c), 416.927(c); *cf.* 20 C.F.R. §§ 404.1527(b), 416.927(b) ("In determining whether you are disabled, we will always consider the medical opinions in your case record together with the rest of the relevant evidence we receive."); SSR 06-03p, 2006 WL 2329939 at *4 ("[T]he [Social Security] Act requires us to consider all of the available evidence in the individual's case record in every case."). Thus, both examining and nonexamining sources provide opinion evidence for the ALJ to consider in rendering a decision. 20 C.F.R. §§ 404.1527(c), (e), 416.927(c), (e). In determining the weight of medical opinions, the ALJ must consider: (1) the examining relationship; (2) the treatment relationship; (3) evidence supporting the conclusions; (4) the consistency of the opinion with the record as a whole; (5) the medical expert's area of specialty; and (6) other factors, including the amount of understanding of disability programs and the familiarity of the medical source with information in the claimant's case record. 20 C.F.R. §§ 404.1527(c)(1)-(6), 416.927(c)(1)-(6). In assessing the medical evidence, the ALJ is "required to state with particularity the weight [given] to the different

33

medical opinions and the reasons therefor." *Sharfarz v. Bowen*, 825 F.2d 278, 279 (11th Cir. 1987).

The opinion of a treating physician must be given substantial or considerable weight unless "good cause" is shown to the contrary.[17]  *Phillips v. Barnhart*, 357 F.3d 1232, 1241 (11th Cir. 2004) (citing *Lewis v. Callahan*, 125 F.3d 1436, 1440 (11th Cir. 1997)); *accord Winschel v. Comm'r of Soc. Sec.*, 631 F.3d 1176, 1178-79 (11th Cir. 2011).  A one-time examining (i.e., consulting) physician's opinion is not entitled to great weight.  *Crawford v. Comm'r of Soc. Sec.*, 363 F.3d 1155, 1160 (11th Cir. 2004) (per curiam).  However, the opinion of an examining physician is generally entitled to more weight than the opinion of a nonexamining physician. *Broughton v. Heckler*, 776 F.2d 960, 962 (11th Cir. 1985).  Also, in the Eleventh Circuit, "the report of a non-examining doctor is accorded little weight if it contradicts an examining doctor's report; such a report, standing alone, cannot constitute substantial evidence." *Edwards v. Sullivan*, 937 F.2d 580, 584 (11th Cir. 1991); *see also Kemp v. Astrue*, 308 Fed. Appx. 423, 427 (11th Cir. Jan. 26, 2009) (per curiam).

---

[17]     Good cause exists when: (1) the treating physician's opinion was not bolstered by the evidence; (2) the evidence supported a contrary finding; or (3) the treating physician's opinion was conclusory or inconsistent with the doctor's own medical records. *Phillips*, 357 F.3d at 1241.

AO 72A
(Rev.8/8
2)

However, "the opinion of a non-examining physician who has reviewed medical records may be substantial evidence if it is consistent with the well-supported opinions of examining physicians or other medical evidence in the record." *Hogan v. Astrue*, Civ. Action No. 2:11cv237-CSC, 2012 WL 3155570, at *5 (M.D. Ala. Aug. 3, 2012) (harmonizing Eleventh Circuit cases). In any event, "the ALJ is free to reject the opinion of any physician when the evidence supports a contrary conclusion." *Sryock v. Heckler*, 764 F.2d 834, 835 (11th Cir. 1985) (quotation marks omitted).

Dr. Muller did opine that Plaintiff "could probably get along with people who were understanding and compassionate of his emotional situation." [R394]. He also stated that Plaintiff's concentration appeared to be limited but that he was "able to focus long enough to complete his basic activities of daily living as well as enjoy listening to talk shows." [R394]. Taken alone, the opinion would appear to suggest that the RFC should be fashioned to include some limitation as to Plaintiff's ability to get along with all other people and his ability to maintain concentration sufficient for employment in a competitive setting.

The ALJ explained, however, that he assigned Dr. Muller's opinion less weight because of the ALJ's concerns about Plaintiff's credibility, which were based, at least in part, on treating-physician Dr. Snowden's diagnosis of partial malingering, which

35

was later in time and therefore not available to Dr. Muller, [R67, 394, 1027-28, 1037-39], and on Dr. Muller's reliance on Plaintiff's uncorroborated reports of multiple psychiatric hospitalizations for suicide attempts.[18] [R67, 393]. The ALJ also observed that Plaintiff was noted to be generally stable with a bright affect and good mood when medicated, [R65, 1028, 1030-31, 1033-35, 1039], and that medical records from March 2010 indicate that Plaintiff reported an ability to function in daily life and get around physically as well as an ability to do work or hobbies. [R64, 308]. Additionally, the ALJ assigned substantial weight to the opinion of Dr. Shahar, who found that Plaintiff generally has the ability to interact appropriately in the workplace and has the ability to maintain concentration, attention, persistence, and pace for simple, repetitive tasks for two-hour periods, [R397], and the opinion of Dr. Williams, who found that Plaintiff is able to related, go out in public, be cooperative, and go to public activities despite his social discomfort and can maintain concentration, persistence, and pace sufficient to allow him to follow and execute simple instructions and make basic work decisions for at least two hours at a time, [R575]. [R67]. Moreover, Dr. Muller was a one-time

_____

[18]    It also bears noting that Dr. Muller noted that Plaintiff "tended to be vague at times" and found that "there was no indication that he was intentionally distorting the facts of his case," but makes no reference to a review of records. [R389-94]. Indeed, Dr. Muller's opinion to rely entirely on Plaintiff's conduct during the examination and Plaintiff's own report of his history and symptoms. [*Id.*].

36

examiner, and the ALJ was therefore under no obligation to defer to his opinion.  *See Eyre v. Comm'r, Soc. Sec. Admin.*, 586 Fed. Appx. 521, 523 (11th Cir. Sept. 30, 2014) (citing *McSwain v. Bowen*, 814 F.2d 617, 619 (11th Cir. 1987), and affirming the ALJ's decision to give "no weight" to the opinion of an examining physician whose opinion was not consistent with the record as a whole).  For these reasons, the undersigned finds that substantial evidence supports the ALJ's decision not to fashion the RFC to Dr. Muller's opinion but instead to rely on the less-restrictive limitations set forth in the opinions of Dr. Shahar and Dr. Williams.

The Court also finds that the ALJ properly considered the portions of Dr. Shahar and Dr. Williams's opinions that Plaintiff raises in his brief.  To accommodate Dr. Williams's opinion that Plaintiff has marked limitations in the abilities to understand and remember detailed instructions, carry out detailed instructions, and interact appropriately with the general public, [R573-74], the ALJ limited Plaintiff to simple work (skill levels 1 to 2) with only occasional superficial contact with the general public, [R64], and to accommodate Dr. Shahar's opinion that Plaintiff is at moderate risk of decompensating under ordinary workplace stress, [R397], the ALJ limited him to low-stress work, defined as "few changes in the workplace and occasional simple decisionmaking," [R64].  Plaintiff does not present any argument or

37

authority to suggest that the accommodations were insufficient to address the opinions. [*See* Doc. 12 at 9].  Thus, the Court finds no reversible error arising from the ALJ's consideration of Dr. Williams's opinion that Plaintiff has marked limitations in the abilities to understand and remember detailed instructions, carry out detailed instructions, and interact appropriately with the general public, [R573-74], or his consideration of Dr. Shahar's opinion that Plaintiff is at moderate risk of decompensating under ordinary workplace stress, [R397].  *See Sanchez v. Comm'r of Soc. Sec.*, 507 Fed. Appx. 855, 856 n.1 (11th Cir. Feb. 8, 2013) (per curiam) (holding that claimant waived certain arguments by not expressly challenging the ALJ's findings).

As to the ALJ's consideration of the opinion of Dr. Oyewo, the Court is at a loss to understand what Plaintiff's challenge might be.  Plaintiff's alleges error only as to the ALJ's determination of his mental RFC.  [Doc. 12, *passim*].  As Plaintiff points out, Dr. Oyewo completed a *physical* RFC, [Doc. 12 at 9 [citing R551-58]], and the Court's review of the ALJ's decision reveals that the ALJ gave substantial weight to Dr. Oyewo's opinion that Plaintiff had no physical limitations.  [R66-67].  Moreover, Plaintiff does not state a reason for his apparent belief that the ALJ mishandled the opinion of Dr. Oyewo.  [*See* Doc. 12 at 9].  Therefore, the issue is not properly before

38

the Court. *See Outlaw v. Barnhart*, 197 Fed. Appx. 825, 827 n.3 (11th Cir. Aug. 10, 2006) (per curiam) (finding that the plaintiff waived an issue by failing to elaborate on the argument or provide a citation to authority regarding the argument); *Ward v. United States*, 154 F.R.D. 291, 293 (M.D. Fla. 1994) (court refuses to supply argument for party).

For all of these reasons, the undersigned concludes that Plaintiff has not shown reversible error with regard to the ALJ's consideration of any of the challenged medical opinions. [*See* Doc. 12 at 9].

### 2. *Cognitive Impairments*

Plaintiff next argues that the ALJ did not adequately address the cognitive impairments evidenced by Plaintiff's ninth-grade education and the cognitive limitations revealed on Dr. Muller's examination. [Doc. 12 at 10]. He points out that the ALJ has a duty to fully and fairly develop the record, [*id*. (citing *Graham v. Apfel*, 129 F.3d 1420, 1422 (11th Cir. 1997); *Todd v. Heckler*, 736 F.2d 641, 642 (11th Cir. 1984))]; contends that there are gaps in the record such that the ALJ should have ordered a consultative examination in order to enable him to make the disability decision, [Doc. 12 at 10 (citing *Pierre v. Sullivan*, 884 F.2d 799, 802 (5th Cir. 1989);

39

*Turner v. Califano*, 563 F.2d 669, 671 (5th Cir. 1977)[19])]; and argues that the absence of a cognitive evaluation prejudiced Plaintiff by depriving him of a full and fair hearing at step three relating to Listing 12.05 (intellectual disability) or evaluation of the RFC, [Doc. 12 at 10].

The Commissioner, in response, presumes that Plaintiff in fact had only a ninth-grade education, despite reports in the record spanning from ninth to twelfth grade. [*Compare* Doc. 13 at 1 *with* R15 (9th or 10th), 180 (12th) , 223 (12th), 331 (10th), 392 (9th)].  She argues, however, that the ALJ did not err by failing to order cognitive testing or to discuss Listing 12.05 because he was under no obligation to investigate a claim that was not raised at the administrative level, [Doc. 13 at 10 (citing *Street v. Barnhart*, 133 Fed. Appx. 621, 627 (11th Cir. May 18, 2005))]; the ALJ fully considered Dr. Muller's examination and the other evidence of Plaintiff's mental condition, [Doc. 13 at 11 [citing R64-67]]; the ALJ considered and accounted for Plaintiff's educational level in assessing his ability to work, [Doc. 13 at 11 [citing R68]]; and Dr. Muller, without testing, estimated Plaintiff's intelligence to be in the borderline

---

[19]     In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), the Eleventh Circuit adopted as binding precedent all of the decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981.

AO 72A
(Rev.8/8
2)

range, [R393], which would not qualify under 12.05, [Doc. 13 at 11 (citing *Jordan Comm'r of Soc. Sec. Admin.*, 470 Fed. Appx. 766, 768-69 (11th Cir. Apr. 20, 2012))].

The Court finds no basis for reversal in Plaintiff's arguments regarding the ALJ's consideration of his cognitive ability. First, the Court finds Plaintiff's procedurally deficient. In its scheduling order, the Court expressly stated to Plaintiff that if he sought remand for the purpose of taking evidence in the form of a consultative examination at government expense, he "must make a proffer of the nature of the evidence anticipated to be obtained." [Doc. 10 at 3]. Plaintiff has made no such proffer. [*See* Doc. 12, *passim*].

Second, while the ALJ does have a duty to develop the record fully and fairly, he is under no obligation to investigate a claim not presented at the time of the application or offered at the hearing as a basis for disability, particularly where, as here, the claimant was represented by an attorney. *Street*, 133 Fed. Appx. at 627. Here, Plaintiff does not point to any portion of the record showing that he claimed intellectual disability at any time at the administrative level, [Doc. 12 at 10], and the Court's review of the record has revealed none. Thus, the Court finds that Plaintiff's failure to raise the claim at the administrative level is also grounds for rejection of the allegation of error. *See Street*, 133 Fed. Appx. at 627 ("This failure alone could dispose of his claim,

41

AO 72A
(Rev.8/8
2)

as it has been persuasively held that an 'administrative law judge is under no "obligation to investigate a claim not presented at the time of the application for benefits and not offered at the hearing as a basis for disability." ' *Pena v. Chater*, 76 F.3d 906, 909 (8th Cir.1996).").

Third, the legal authority Plaintiff cites also suggests that the ALJ did not make a reversible error in declining to order cognitive testing. [*See* Doc. 12 at 10 (citing *Pierre v. Sullivan*, 884 F.2d at 802)]. In fact, in *Pierre*, the Fifth Circuit held that the ALJ was *not* required to order cognitive testing in order to discharge his duty to fully and fairly develop the record. *Pierre*, 884 F.2d at 803. The court began by explaining that "the ALJ's duty to undertake a full inquiry . . . 'does not require a consultative examination at government expense unless the record establishes that such an examination is *necessary* to enable the administrative law judge to make the disability decision,' " *id*. at 802 (quoting *Turner*, 563 F.2d at 671), and that the decision to require such an examination is within the discretion of the ALJ, *Pierre*, 884 F.2d at 802. The court then went on to discuss a record remarkably similar to the record presently before the Court: like Plaintiff, the claimant had not listed intellectual disability in her request for benefits; she had never requested that an intelligence test be performed; and no doctors suggested that her intelligence be tested; yet, as in Plaintiff's case, there were

42

also several isolated comments about the limits of the claimant's intellectual functioning. *Id.* (citing notes suggesting an inability to read and write (a deficiency greater than those reflected in the record presently before the Court); difficulty with the day of the week; and inability to identify the President of the United States). The court noted, however, that other parts of the medical reports suggested that the claimant's medical abilities were normal and ultimately held that "isolated comments about the limits of [the claimant's] intellectual functioning, when viewed within the record as a whole, were not sufficient to raise a suspicion" that the claimant was intellectually disabled. *Id.* at 802-03 (observing notes stating that the claimant was able to think clearly; that she was able to watch television, read, ride the bus herself, handle her own finances, shop, go to church, and visit friends; that her condition did not severely affect her ability to think, remember, make decisions, get along with others, and take part in most activities; and that she appeared to be of average intelligence). Much like the record in *Pierre*, while Dr. Muller's opinion states that Plaintiff had some impairment in cognitive function in that he had difficulty with immediate memory, it also states that Plaintiff's judgment was intact; he knew the month, the day of the week, and the name of the president; his inability to work was due to his depression; he did not appear to have difficulty understanding or carrying out simple instructions; he had concentration

43

sufficient to complete his basic activities of daily living and enjoy listening to talk shows; he was capable of managing his own funds; and that the quality of Plaintiff's speech and his vocational history suggested borderline intelligence.  [R392-94]. Moreover, the VE's testimony regarding the jobs available to a person of Plaintiff's age and experience took into account Plaintiff's testimony that he had only a ninth- or tenth-grade education and the ALJ's limitation to simple work with few changes and only occasional simple decisionmaking, and the jobs listed by the VE and relied upon by the ALJ consisted exclusively of unskilled jobs.  [R15, 50-51, 68-69].  Thus, the Court concludes that even under Plaintiff's own authority, he has not shown that the ALJ breached an affirmative duty to order intelligence testing or that he was prejudiced by such a breach.

### 3.     *Concentration, Persistence, or Pace*

Plaintiff next argues that the ALJ erred because he found "moderate" difficulties in maintaining concentration, persistence, or pace, [R63], and that the RFC's restriction to simple, low-stress work and only occasional superficial contacts with the general public does not adequately address the finding.  [Doc. 12 at 11 (citing *Jarrett v. Comm'r of Soc. Sec.*, 422 Fed. Appx. 869, 872 (11th Cir. Apr. 11, 2011); *Winschel v. Comm'r of Soc. Sec.*, 631 F.3d 1176, 1180 (11th Cir. 2011))].  He also states that the

AO 72A
(Rev.8/8
2)

ALJ made no findings in regard to responding appropriately to supervision, coworkers, and usual work situations, which are all required in order to perform the mental demands of work.  [Doc. 12 at 11].

The Commissioner, in response, points out that it is not true as a matter of law that a limitation to unskilled or simple work is never sufficient to account for moderate limitations in concentration, persistence, or pace, citing cases in which the Eleventh Circuit has held that a hypothetical question could sufficiently account for impairments in concentration, persistence, or pace if it includes a limitation to unskilled or simple work or routine tasks and the medical evidence demonstrates that the claimant has the ability to perform those tasks despite a limitation in concentration, persistence, or pace. [Doc. 13 at 8-9 (citing *Thornton v. Comm'r, Soc. Sec. Admin.*, 597 Fed. Appx. 604, 612 (11th Cir. Feb. 11, 2015) (limitation in RFC to "simple, non-detailed tasks" sufficient to account for moderate limitations in concentration, persistence, or pace, where record included medical opinion evidence indicating that the claimant could understand, remember, and carry out simple instructions; that despite moderate limitation in the ability to sustain concentration for extended periods, the limitation was not substantial and the claimant's concentration was adequate for basic activities; that the claimant could sustain attention in two-hour segments; and that although the claimant would be

AO 72A
(Rev.8/8
2)

expected to work at a slightly reduced pace, she was likely to persist with work-related tasks); *Szilvasi v. Comm'r, Soc. Sec. Admin*., 555 Fed. Appx. 898, 902 (11th Cir. Feb. 7, 2014) (limitation in RFC to "simple, repetitive tasks, with superficial interactions with others" sufficient to account for moderate limitations in concentration, persistence or pace, where record included medical opinion evidence indicating that the claimant could understand and follow at least simple instructions, concentrate for shorter time periods, and make simple work-related decisions, and was not significantly limited in his ability to understand, remember, and carry out very short and simple instructions); *Neefe v. Comm'r of Soc. Sec*., 531 Fed. Appx. 1006, 1007 (11th Cir. Sept. 27, 2013) (limitation to only simple tasks or unskilled work sufficient where ALJ determined medical evidence demonstrated claimant could engage in simple work despite moderate limitation in concentration, persistence, or pace); *Jarrett*, 422 Fed. Appx. at 872 (limitation in RFC to low stress and simple and routine tasks sufficient to account for moderate limitations in concentration, persistence, or pace, where record included medical opinion evidence indicating that the claimant was "able to follow simple instructions, complete simple tasks, make decisions, avoid hazards, and relate adequately to function in the workplace" and was "able to understand, remember, and carry out simple tasks," despite moderate limitation in her ability to

46

maintain attention and concentration for an extended period))].  The Commissioner also points to medical opinion evidence she contends supplies substantial evidence to support the ALJ's determination that Plaintiff could perform within the mental RFC despite his limitations in concentration, persistence, or pace.  [Doc. 13 at 7-8, 10].

Here again, the Court concludes that the Commissioner has the better end of the argument.  Indeed, in *Jarrett*, one of the cases upon which Plaintiff principally relies, the court held that "an ALJ's hypothetical restricting the claimant to simple and routine tasks adequately accounts for restrictions related to concentration, persistence and pace where the medical evidence demonstrates that the claimant retains the ability to perform the tasks despite concentration deficiencies."  *Jarrett*, 422 Fed. Appx. at 872.  It also clarified that *Winschel*, the other case upon which Plaintiff relies, was not to the contrary, but rather that in *Winschel* the lack of an RFC limitation in the category of concentration, persistence or pace was reversible error because the medical evidence did not support that the claimant was able to perform the scope of work allowed by the RFC without such limitations.  *Jarrett*, 422 Fed. Appx. at 872 n.1.

In the present matter, like *Jarrett* and the other cases cited by the Commissioner, and unlike *Winschel*, it is clear that the ALJ considered the medical evidence regarding all of Plaintiff's limitations before finding that he could perform unskilled, low-stress

47

work requiring only occasional superficial contacts with the general public.  As noted above, the ALJ gave substantial weight to the opinions of reviewing psychologists Dr. Shahar and Dr. Williams.  [R67].  Dr. Shahar opined that Plaintiff can perform simple instructions and that although he is likely to have difficulty with concentration, attention, persistence, or pace, he retained the ability to do so for simple repetitive tasks, for two-hour periods. [R397].  She further opined that although Plaintiff is likely to have interpersonal difficulty with the public, coworkers, and supervisors, he generally has the ability to interact appropriately in the workplace, and that Plaintiff is likely to have difficulty with frequent or major workplace changes but not with lesser ones. [R397].  Dr. Williams opined that Plaintiff is able to perform simple instructions, can maintain attention and concentration for at least two-hour periods, and can make basic work decisions, and although she opined that because of Plaintiff's limitations in understanding and memory and concentration, persistence, or pace, he would "do better" with simple, routine tasks and supervisor encouragement, she did not state that those accommodations were necessary.  [R575].  She also opined that Plaintiff had marked limitations with multitasking and the immediacy of direct work with the public and that he tends to be withdrawn, but also that he is able to relate, go out in public, be cooperative, undertake public activities, such as going to church and using public

48

transportation, despite his social discomfort.  [R575].  She further stated that Plaintiff would "do better" with solo or small group tasks and supervisor encouragement; that although he might have initial moderate limitations with work changes, he would adapt; and, in sum, that he had no substantial psychological limitations at that time.  [R575]. The ALJ noted the limitations stated by the state agency psychologists, [R66], and made the determination that Plaintiff is capable of performing "simple (skill levels 1-2), low stress (few changes in the workplace and occasional simple decisionmaking) jobs only, and can have only occasional superficial contacts with the general public, [R64]. It is therefore obvious that the ALJ did not simply presume that Plaintiff could perform "simple tasks," [Doc. 12 at 11], but instead examined the medical opinions and made an independent finding regarding the extent to which Plaintiff's impairments limited his ability to work.  The Court concludes that this opinion evidence constitutes substantial evidence in support of the mental RFC and therefore finds no reversible error arising from Plaintiff's challenge to the ALJ's consideration of his limitations in the category of concentration, persistence, or pace.

### B.    Credibility

Plaintiff next argues that the ALJ erred in his credibility evaluation by giving too much weight to medical records of treatment visits where Plaintiff reported that he did

49

not have suicidal ideation or where he was described as having a "bright affect." [Doc. 12 at 12-14].  He suggests that the credibility determination was based on a one-sided or incorrect view of the evidence and points out that SSR 96-7p requires consideration of the entire case record and precludes the ALJ from disregarding a claimant's statements about the intensity and persistence of his symptoms or their effect on the claimant's ability to work solely because they are not substantiated by objective medical evidence.  [*Id*. at 12].  Plaintiff also argues that a claimant need not be an invalid to be found disabled for the purposes of the Social Security Act and that his participation in the activities of daily living will not rebut his subjective statements of impairment unless there is proof that he engaged in those activities for sustained periods of time comparable to those required to hold a sedentary job.  [*Id*. at 12-13]. He also points to cases in which courts have concluded that a claimant whose claim is based on a mental condition does not have to show a twelve-month period of impairment unbroken by any symptom-free interval, and he asserts that his symptoms were consistent throughout.  [*Id*. at 13].

To establish disability based on a claimant's testimony of pain and other symptoms, the claimant must show "(1) evidence of an underlying medical condition; and (2) either (a) objective medical evidence confirming the severity of the alleged

50

pain; or (b) that the objectively determined medical condition can reasonably be expected to give rise to the claimed pain." *Wilson v. Barnhart*, 284 F.3d 1219, 1225 (11th Cir. 2002) (citing *Holt v. Sullivan*, 921 F.2d 1221, 1223 (11th Cir. 1991)).  The ALJ need not cite to the pain standard so long as "his findings and discussion indicate that the standard was applied."  *Wilson*, 284 F.3d at 1225-26.

The pain standard "is designed to be a threshold determination made prior to considering the plaintiff's credibility."  *Reliford v. Barnhart*, 444 F. Supp. 2d 1182, 1189 n.1 (N.D. Ala. 2006).  Thus, "[i]f the pain standard is satisfied, the ALJ must consider the plaintiff's subjective complaints."  *James v. Barnhart*, 261 F. Supp. 2d 1368, 1372 (S.D. Ala. 2003).  In doing so, the ALJ considers the lay evidence, medical opinions, and objective medical evidence; the claimant's daily activities; the location, duration, frequency, and intensity of the pain or other symptoms; precipitating and aggravating factors; the type, dosage, effectiveness, and side effects of any medication taken to alleviate the pain or other symptoms; other treatment received for the pain or other symptoms; any measures used to relieve the pain or other symptoms; and other factors concerning the claimant's functional limitations and restrictions due to pain or other symptoms.  20 C.F.R. §§ 404.1529(c); 416.929(c).  When a claimant's subjective testimony is supported by medical evidence

51

that satisfies the pain standard, he may be found disabled. *Holt*, 921 F.2d at 1223. If the ALJ determines, however, that claimant's testimony is not credible, "the ALJ must show that the claimant's complaints are inconsistent with his testimony and the medical record." *Rease v. Barnhart*, 422 F. Supp. 2d 1334, 1368 (N.D. Ga. 2006) (Feldman, M.J.). This credibility determination does not require the ALJ to cite to particular phrases or formulations, but it also cannot be a broad rejection so as to prevent the courts from determining whether the ALJ considered the claimant's medical condition as a whole. *Dyer v. Barnhart*, 395 F.3d 1206, 1210-11 (11th Cir. 2005). After considering a claimant's complaints of pain or other subjective symptoms, the ALJ may reject them as not credible, and that determination will be reviewed for substantial evidence. *Wilson v. Heckler*, 734 F.2d 513, 517 (11th Cir. 1994).

After careful review, the Court finds no merit in Plaintiff's allegation that the ALJ did not apply the appropriate legal standards in assessing his credibility. First, despite Plaintiff's suggestion to the contrary, he does not point to anything in the decision indicating that the ALJ considered Plaintiff's daily activities to be evidence of Plaintiff's ability to function in a competitive work environment, nor has he pointed to any portion of the decision to support his suggestion that the ALJ found him not to be disabled within the context of the Social Security Act on the ground that he was not

52

"an invalid."  [Doc. 12 at 12-13].  The Court's own review of the decision has also

revealed no such error.  [*See* R60-69].  Instead, the decision makes clear that the ALJ

considered Plaintiff's daily activities when assessing his credibility, [*see* R64, 66-67],

which, as a matter of law, he was entitled to do, *see Leiter v. Comm'r of Soc. Sec.

Admin.*, 377 Fed. Appx. 944, 948 (11th Cir. May 6, 2010) (per curiam) (affirming

decision in which ALJ found the claimant's allegation that she was unable "to do even

simple tasks" not to be fully credible because it was inconsistent with her testimony of

substitute teaching twice a week and working in a "family club" where she takes money

at the door); *Dyer*, 395 F.3d at 1212 (affirming the ALJ's credibility determination

where the ALJ considered the claimant's activities of daily living, the frequency of his

symptoms, and the types and dosages of his medications, and concluded that his

subjective complaints were inconsistent with his testimony and the medical record);

*Blacha v. Sec'y of Health & Human Servs.*, 927 F.2d 228, 231 (6th Cir. 1990)

(per curiam) ("[A]n ALJ may consider household and social activities in evaluating

complaints of disabling pain."); *cf. Evans v. Comm'r, Soc. Sec. Admin.*,

551 Fed. Appx. 521, 524 (11th Cir. Jan. 6, 2014) (per curiam) (discounting a medical

opinion because it "was contradicted by [the plaintiff's] self-reported daily activities,

53

AO 72A
(Rev.8/8
2)

which included various household chores, light yard work, driving, shopping, visiting with friends and family, and playing chess daily").

Similarly, Plaintiff has pointed to nothing in the opinion to suggest that the ALJ reached his decision of non-disability based on a determination that Plaintiff was required to manifest severe symptoms of mental impairment for a solid twelve-month period but did not, [Doc. 12 at 13], and again, the Court finds no such reasoning in the opinion, [*see* R60-69].  Rather, the ALJ compared Plaintiff's reports that he was depressed all the time, that he cried three to four days per week, sometimes all day, that suicidal and homicidal thoughts never left his mind, that he had been having visual hallucinations his whole life and other symptoms of mental illness since childhood, and that he had been hospitalized multiple times for suicide attempts or ideation, to medical records indicating that he had no complaints about mental issues until late 2009, that he denied visual hallucinations, that his treating physician suspected partial malingering, that he sometimes had a bright affect, that he often denied having suicidal or homicidal thoughts, and that his reports of hospitalization were unsubstantiated and inconsistent.  [R64, 66-67].

Finally, while it may be true that the ALJ did not expressly remark upon each aspect of Plaintiff's daily activities that support his allegations of impairment, as

54

discussed above, it is not necessary for the ALJ to cite every piece of evidence so long as it is clear that he reviewed the evidence and considered Plaintiff's condition as a whole.  *See Hennes*, 130 Fed. Appx. at 348 n.11; *Dyer*, 395 F.3d at 1211.  Here, it is clear that the ALJ considered Plaintiff's testimony of sleep problems, hallucinations, constant thoughts of homicide and suicide, unrelenting depression, and multiple suicide attempts, but based on the medical record and Plaintiff's own inconsistent reports of his symptoms and activities, found the allegations to be less than fully credible.  [*See* R66-67].

The Court therefore concludes that Plaintiff has failed to show that the ALJ committed reversible error in finding Plaintiff's allegations of functional limitations less than fully credible.

### C.    *VE Testimony*

Finally, Plaintiff contends that because the ALJ erred in evaluating his credibility and the evidence of his mental limitations, the RFC is too broad, the hypothetical question the ALJ posed to the VE was thus incomplete, and the VE testimony is therefore insufficient to serve as substantial evidence of non-disability. [Doc. 12 at 14]. Because the Court found no reversible error in the ALJ's RFC assessment, the hypothetical question to the VE was likewise untainted.  Consequently, the undersigned

finds that the VE testimony constitutes substantial evidence to support the ALJ's determination that a substantial number of jobs are available in the national economy to a person of Plaintiff's age, education, experience, and RFC.

## VII.   CONCLUSION

For the reasons above, the Court **AFFIRMS** the final decision of the Commissioner.   The Clerk is **DIRECTED** to enter final judgment in the Commissioner's favor.

**IT IS SO ORDERED and DIRECTED**, this the 28th day of March, 2016.

ALAN J. BAVERMAN
UNITED STATES MAGISTRATE JUDGE

56